IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELENA M., by and through her Parents, :
HANS M. and MILDRED M., :
of Philadelphia, Pa., 19125 :
 : Civil Action
   Plaintiffs :
  v. : No.
 :
SCHOOL DISTRICT of PHILADELPHIA :
440 N. Broad Street, :
Philadelphia, Pa., 19130 :
 :
   Defendant. :

## COMPLAINT

## I. Introduction

  1. This action is brought by Elena M., a minor child with disabilities, and her parents, Hans M. and Mildred M. ("Parents," and together with Elena M., the "Plaintiffs" or the "Family"), against Defendant School District of Philadelphia (the "District"). Elena is a six-year-old with Autism and significant communication deficits, behavioral needs, and occupational therapy needs. In the beginning of 2021, her Parents contacted the District to ensure that Elena would have an appropriate educational program and placement for the start of the 2021-22 school year, Elena's kindergarten year. From the transition process forward, the District failed to meet its obligations to Elena and her Family by, *inter alia*, failing to timely evaluate Elena and hold an IEP meeting, failing to provide agreed-upon services, failing to offer a school-aged IEP until November 2021, preventing Parents from meaningfully participating in the IEP development process, and moving Elena in and out of three inappropriate placements in which she did not make meaningful educational progress.

  2. The Family's claims are brought under the Individuals with Disabilities Education

1

Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and its federal and state implementing-regulations; and Chapters 14 and 15 of the Pennsylvania Code.

      3.      After fully considering the entire record and the failures of the District to provide Elena with a Free Appropriate Public Education ("FAPE"), this Court should determine that the District violated the foregoing statutes; affirm the Hearing Officer's finding that Elena is owed compensatory education, but modify the award to reflect the educational losses Elena suffered; reverse the Hearing Officer's decision with regard to the request for private school placement and award Elena a placement at Talk School; award reasonable attorneys' fees and costs; and any other relief this Court deems just. In the alternative, this Court should vacate and remand the matter to be decided by the hearing officer who presided over the hearing sessions and heard the live testimony.

## II.    Parties

      4.      Elena was born in 2016, and, at all times relevant to this action, resided within the geographical boundaries of the Defendant School District. Elena is a student with disabilities as defined under IDEA and a Protected Handicapped Student under Section 504 and the ADA.

      5.      Hans M. and Mildred M. are Elena's parents. At all times relevant to this action, Elena has resided with her parents within the geographical boundaries of the Defendant School District.

      6.      The District is located at 440 N. Broad Street, Philadelphia, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by

Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA and Section 504. *See* 22 Pa. Code Chapters 14 and 15; *see also* 24 P.S. Chapter 13.

### III.   **Procedural History**

7.      In March 2021, Elena began the process to transition from preschool Early Intervention services to school-aged special education services.

8.      On July 14, 2021, Hans M. and Mildred M. ("Parents") filed a Special Education Due Process Complaint because Elena did not have an IEP for her upcoming kindergarten school year.

9.      On August 11, 2021, Parents and the District entered into a mediation agreement, which established an interim plan for the start of the school year in response to the July 14, 2021 Due Process Complaint.

10.     On May 20, 2022, the Family filed a new Due Process Complaint against the District seeking the development of an appropriate program and placement for Elena, placement in a private school of the parents' choosing (the Talk School) until the District offers an appropriate program, and compensatory education for the District's violations of IDEA and Section 504.

11.     Administrative Hearing Officer Cheryl Cutrona ("Hearing Officer Cutrona") held an evidentiary hearing over July 20, 21, and 26, 2022, at which both parties presented witnesses and documentary evidence on a live, videoconferencing platform.

12.     During the hearing, the Family indicated to Hearing Officer Cutrona that concluding before the start of the school year was of great importance to the Family so that Elena could begin the new school year with clarity as to her placement. Hearing Officer Cutrona set the Decision Due Date to Monday, August 29, 2022 to conform with the Family's request.

13.     On Friday, August 26, 2022, Hearing Officer Michael J. McElligott contacted the parties to share that Hearing Officer Cutrona had been hospitalized.

14.     On Saturday, August 27, 2022, counsel for the Family requested a conference call to discuss the matter and a one-day extension of the Decision Due Date so that the Family would be able to confirm with the Talk School that Elena's spot for the 2022-23 school year would be held if the Hearing Officer Decision were issued later.

15.     On Sunday, August 28, 2022, counsel for the District moved for an extension of the Decision Due Date so that either Hearing Officer McElligott or Hearing Officer Cutrona could render a decision.

16.     On Sunday, August 28, 2022, Hearing Officer McElligott assumed jurisdiction over the matter and set the new Decision Due Date to September 1, 2022; no conference call was convened.

17.     On Wednesday, August 31, 2022, Hearing Officer Cutrona contacted the undersigned to schedule a conference call in an unrelated matter, offering dates in early September. Hearing Officer Cutrona was not incapacitated and demonstrated ability to resume the case at some point in the near future.

18.     On Wednesday, August 31, 2022, the Family informed Hearing Officer McElligott that Talk School could hold Elena's spot and requested that jurisdiction be returned to Hearing Officer Cutrona for the decision to be rendered upon her recovery because Hearing Officer Cutrona heard the original, live testimony which enabled her as the factfinder to personally observe the witnesses.

19.     On September 1, 2022, before the Decision was issued and before the District responded to indicate if it opposed the Family's request, Hearing Officer McElligott contacted the

parties to explain that Hearing Officer Cutrona declined to reassert jurisdiction.

20.     Later in the day, on September 1, 2022, Hearing Officer McElligott rendered the Decision awarding the Family 100 hours of compensatory education but denying all other claims.

21.     The Family now appeals to this Court and respectfully requests the Court reverse Hearing Officer McElligott's Decision and award appropriate relief to the Family, including pre-vailing party attorneys' fees, or, in the alternative, that this Court vacate and remand the matter to Hearing Officer Cutrona for decision.

IV.     **Jurisdiction and Venue**

22.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

23.     Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued an administrative Special Education Due Process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

24.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory and equitable relief and any further relief that this Court deems necessary and proper.

25.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

V.     **Standard of Review**

26.     This Court is required to undertake a fully independent review of the records and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982). This review is far broader and more searching than a district court's review of other

administrative matters. Judicial review in IDEA cases is called "modified de novo" review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995). No deference should be afforded to the state administrative process, as the hearing officer who decided this matter was unnecessarily and improperly substituted for the assigned hearing officer who conducted the entire proceeding and heard all witnesses; therefore, the deciding hearing officer had no opportunity to observe testimony and determine the proper credibility and weight to be accorded to the various witnesses, testimony, and relevant exhibits.

27.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

28.     In conducting a modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P*., 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

29.     However, the reason for the deference to the administrative agency is the first-hand

6

observation of the hearing officer in assessing the credibility and weight of the testimony. No deference is due without such first-hand observations. *See S.H., supra,* 336 F.3d at 270.

30.     The modified de novo review stems from an interpretation of the IDEA and does not apply to Section 504 and ADA claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F.Supp.3d 334, 344 (2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims, as opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

## VI.    <u>Applicable Law</u>

A.     **IDEA requires that a school district identify and evaluate all children with disabilities who live in the district and the transition from Early Intervention services to school-aged services must not result in an interruption to a student's special education services.**

31.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

32.     Students with disabilities receiving early intervention services are entitled to transition to school-aged services, without interruption, and with appropriate procedural protections. 20 U.S.C. § 1419. Pennsylvania regulations provide that school districts' responsibilities for the transition process for the new school year commence with receipt of the parents' Intent to Register form. Pa. Dep't of Educ., *Early Intervention Transition: Preschool Programs to School–Aged Programs* (2003). The preschool Early Intervention program must convene a transition meeting, in which the school district of residence must participate. *Id.*

B.     **An appropriate evaluation must comprehensively evaluate a child in all**

**suspected areas of need.**

33.     The public agency must ensure that a student's "evaluation is sufficiently compre-hensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304.

34.     More specifically, the requirements for an appropriate evaluation are set out in the IDEA and its implementing regulations (*see* 34 C.F.R. §§ 300.301-300.310) and require, among other things, that an evaluation, including reevaluations, include a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the stu-dent, including information from the parents, and assess the child in all areas of suspected disabil-ity. 34 C.F.R. § 300.304. Moreover, an evaluation must be sufficient in its scope to identify the educational needs of a student, including present educational levels and related developmental needs, and assist in determining what supports and modifications to the student's program are necessary. 34 C.F.R. §§ 300.304, 300.305.

**C.     After the school district identifies a student's needs in an Evaluation Report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

35.     At the beginning of each school year, a school district is required to develop an IEP for every child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).

36.     The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP devel-opment under the IDEA: (1) whether the district complied with the procedures set forth in the

IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit.  *Rowley*, *supra*, 458 U.S. at 206-07, 102 S.Ct. at 3051; *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

37.     The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

38.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires *more* than a program reasonably calculated to allow a student to make "*some* progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

39.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful*

educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp.3d 618, 632 (E.D. Pa. 2017) (*citing Endrew F.*); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)).

40.     It is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

41.     The appropriateness of an IEP is determined as of the time it is offered to the student written. *Susan N.*, *supra*, 70 F.3d at 762.

**D.     Compensatory education is an available remedy for a District's denial of FAPE to a student.**

42.     When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 n.11 (3d Cir. 1999); *M.C.*, *supra*, 81 F.3d at 397. Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, *supra*, 916 F.2d at 873.

43.     The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

**E.     Prospective private school placement is an available equitable remedy.**

44.     Prospective private school placement is a permissible remedy under Third Circuit

10

precedent. *D.S. v. Bayonne Bd. Of Educ.*, 602 F.3d 553, 559 (3d Cir. 2010).

45.      Hearing officers possess broad discretion to fashion an appropriate remedy under the IDEA. *See, e.g., Forest Grove v. T.A.*, 557 U.S. 230, 239-40, 129 S.Ct. 2484, 2492 (2009); *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 718 (3rd Cir. 2010).

46.      Pennsylvania Hearing Officers have ordered prospective private school placement as an equitable remedy and used the Supreme Court's *Burlington-Carter* tuition reimbursement test to review parents' claims. *S.J. v. Sch. Dist. of Philadelphia,* ODR No. 25522-21-22 (February 4, 2022); *A.D. v. Young Scholars – Kenderton Charter School,* ODR No. 15203-14-15 (December 24, 2014); *S.L. v. Exeter Township Sch. Dist.*, ODR No. 15850-1415 (June 2, 2015).

47.      Further, the IDEA statute and regulations permit a parent or school district to file a due process complaint concerning educational placement, and require a continuum of alternative placements, including special schools; thus, prospective placement is an appropriate remedy for a parent to request. 34 C.F.R. §§300.115(a), (b)(1); 300.507(a).

48.      The Supreme Court developed a three-prong test for tuition reimbursement, often referred to as the *Burlington-Carter* test. *See Florence County School Dist. v. Carter*, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-66 (1993); *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996, 2002-04 (1985); 34 C.F.R. § 300.148(c).

49.      Under the *Burlington-Carter* test for tuition reimbursement, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP. *Burlington*, 471 U.S. at 369-70

50.      After determining whether the school district offered FAPE, the court must determine whether the private school was appropriate. *Id*.

51.      Once a court determines a placement is appropriate, the court may reduce the tuition

reimbursement only if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

> **F.**   **The IDEA requires that parents be afforded meaningful parental participation.**

52.    Parents, as IEP team members, must be allowed to meaningfully participate in the IEP drafting process. 20 U.S.C. § 1400; *Montgomery Cnty. Intermediate Unit No. 23 v. A.F.*, 506 F.Supp.3d 293, 309 (E.D. Pa. 2020) (hereinafter, "MCIU") (*quoting D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F.Supp. 2d 764, 776 n.15 (D.N.J. 2010), *aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012) (quotation marks omitted)).

53.    Meaningful participation requires a reasonable degree of understanding to allow parents to make an informed decision about their child's education. *MCIU*, 506 F.Supp.3d at 306. "Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because determination can serve to exclude parents from meaningfully participating in the decision making process." *D.B.*, 751 F.Supp.2d at 771; *Cf. Fuhrmann v. East Hanover Bd. Of Educ.*, 993 F.2d 1031, 1036-37 (3d Cir. 1993) (no predetermination when parents were meaningfully involved in the IEP development).

54.    Notably, a lack of meaningful parental participation itself may deny FAPE and satisfy the first prong of a tuition reimbursement analysis. *MCIU*, 506 F.Supp.3d at 312 (affirming the hearing officer's finding that parents were significantly impeded from meaningful participation in the IEP process which denied FAPE in a tuition reimbursement case).

> **G.**   **Students with disabilities are also entitled to a free appropriate public education pursuant to Section 504.**

55.     Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

56.     Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C.§ 794; *see also* 34 C.F.R. § 104.1 *et seq.*

57.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

58.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA). The eligibility standards under Section 504 for children with disabilities are broader than the narrower, categorized disabilities recognized by IDEA "and thus, some students covered by Section 504 are not covered under the IDEA." *Batchelor v. Rose Tree Media School Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014) (*compare* 20 U.S.C. § 1401(3) *with*

42 U.S.C. § 12102(1) (incorporated by reference in 29 U.S.C. § 705(9)(B))).

59.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. Sch. Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

60.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood*, 172 F.3d at 253.

**H.     Where a school district violates IDEA and Section 504, it also violates the ADA.**

61.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.*

**I.     A parent is entitled to attorney's fees and costs if the parent is the prevailing party.**

62.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

VII.   **Factual History**

63.     Plaintiffs incorporate by reference the preceding paragraphs.

64.     Elena is a six-year-old student with Autism, significant speech and language needs, behavioral needs, and occupational therapy needs who completed kindergarten in the District during the 2021-22 school year.

65.     Results of an independent educational evaluation indicate that Elena requires small group programming throughout the day based on her language, social, behavioral, and academic needs. She was observed to be unsuccessful in general education even with the support of a teacher and two adults dedicated to supporting her. She requires ongoing and integrated language and social skills instruction throughout her school day.

66.     Prior to Elena's transition to kindergarten, she received preschool Early Intervention services.

67.     In January or February 2021, Parents contacted H.A. Brown, an elementary school within the District, to request information about preparing for Elena's transition to school-aged special education programming.

68.     The Parents offered to send the District Elena's early intervention records when they learned that there was a delay in the District receiving the records from the Early Intervention provider, but the District did not agree.

69.     The District sent a permission to reevaluate dated April 6, 2021; Parents consented and provided input.

70.     The District created and shared a Psychoeducational Re-Evaluation Report for Elena in June 2021 (the "June 2021 Evaluation Report").

71.     The District invited Parents to an "initial evaluation review" meeting to be held on

June 11, 2021. The District explained to Parents that the purpose of the meeting was to discuss the evaluation.

72.     On June 11, 2021, Parents attended the evaluation review meeting and the school psychologist discussed the portions of the evaluation that were completed; Parents did not discuss or review an IEP with the District at this meeting and did not discuss the placement for Elena. Only the psychologist, Ms. Stearns (a special education teacher from H.A. Brown), and Principal Carnivale from H.A. Brown were present at the meeting.

73.     The special education teacher was present for less than ten minutes.

74.     The principal stayed for 30 to 40 minutes of the meeting but left before Parents could ask questions.

75.     No related services providers (e.g. speech therapy, occupational therapy, behavior support) attended the meeting, although Elena received these services in Early Intervention.

76.     The District did not offer any summer testing dates to complete Elena's additional evaluations before the start of the school year.

77.     The District created a proposed Notice of Recommended Educational Placement ("NOREP") on June 4, 2021, recommending comparable school age services for 90 days in Supplemental Autistic Support based on a review of her Early Intervention IEP .

78.     The School District did not give the Parents an opportunity to provide input into the recommended placement described in the June 4, 2021 NOREP.

79.     The District also created a NOREP dated June 10, 2022, determining that school-based occupational therapy services were not necessary for Elena. This NOREP is not marked "proposed."

80.     The District had never discussed any occupational therapy recommendations with

the Family or an IEP team before creating the NOREP.

81.     After the June 11, 2021 meeting, the Parents contacted the District many times via email and phone to attempt to create an appropriate IEP for Elena.

82.     In July 2021, the Acting Executive Director for Field Support, Ms. Moody, spoke with Elena's father and informed him that there already was an IEP for Elena, which she emailed to Parents.

83.     Parents had never seen that IEP, dated June 11, 2021, before Ms. Moody emailed it in July 2021, and they did not participate in any meeting to develop the IEP.

84.     The June 11, 2021 IEP lists a regular education teacher that Parents have never met as an attendee.

85.     The June 11, 2021 IEP stated that Elena would receive Autistic Support outside of the regular education classroom, although placement and supplementary aids and services had never been discussed with the Parents.

86.     The goals in the June 11, 2021 IEP were never discussed with the Parents.

87.     On July 14, 2021, Parents filed for due process seeking an IEP meeting; they then agreed to participate in mediation, which was held over two dates during the summer of 2021.

88.     The parties entered into a signed mediation agreement that specified that Elena would start the year with her pendent IEP from Early Intervention, that she would receive the services of a Registered Behavior Technician ("RBT"), a paraprofessional with certification in Applied Behavior Analysis in school, and that she would begin kindergarten at Hackett Elementary, another nearby elementary school.

89.     The only IEP meeting offered to Parents before the start of the school year was five days before the start of the school year.

90.     The District claimed the delay in offering an IEP was due to staffing issues.

91.     Parents believed it would be better for Elena to continue the Early Intervention IEP than to wait until five days before school started to begin the IEP development process using an incomplete Evaluation Report.

92.     Nonetheless, Parents attended an August 25, 2021 IEP meeting convened by H.A. Brown, the school Elena was previously set to attend, but the school was not prepared with Elena's evaluations and did not recommend any specific IEP to Parents.

93.     The 2021-22 school year began on August 31, 2021.

94.     Elena's initial speech and language evaluation was completed September 3, 2021.

95.     The District's occupational therapist at Hackett disagreed with the findings from the District's June 2021 Evaluation Report and requested permission to reevaluate Elena.

96.     The new October 6, 2021 occupational therapy evaluation correctly found that Elena is eligible for occupational therapy services.

97.     Elena's Functional Behavior Assessment was not completed until about October 28, 2021.

98.     Despite the executed mediation agreement, the District did not provide an RBT for Elena until October 25, 2021.

99.     The District did not begin the search for an RBT until after the school year began despite the executed mediation agreement.

100.    Before the RBT began, the District indicated to Parents that Elena was struggling in general education, but the District stated that it could not address the issues until after the RBT began.

101.    When the RBT began, the RBT was frequently absent and Elena did not have the

services on those days.

102.    The general education teacher told the Parents that she was not able to give Elena the individualized attention she required with the classroom size of 22 students and that she would assign Elena busy work to occupy her.

103.    The District was not progress monitoring Elena's pendent IEP goals and was not sharing any data that was collected with the Parents.

104.    During the fall of 2021, the IEP team determined that the Autistic Support classroom was not appropriate for Elena as she was too advanced for it and Elena moved to Learning Support pursuant to the September 30, 2021 NOREP.

105.    Parents did not know which goals or specially designed instruction would be in place in the Learning Support classroom and there was no finalized school-age IEP.

106.    At IEP meetings, the Parents received confusing and contradictory input from the team, and they did not understand what the recommendation was or how it was responsive to Elena's unique needs.

107.    The IEP team met on November 12, 2021 and developed a new IEP for her Learning Support placement.

108.    The IEP states that a Board Certified Behavior Analyst ("BCBA") would provide support only two hours per month.

109.    The IEP incorrectly states that Elena does not have behaviors that interfere with her learning.

110.    The November 2021 IEP largely relies on present levels from June 2021, before Elena's transition.

111.    Elena's goals do not indicate whether she will perform the goal behavior with or

without support from her one-to-one aide or RBT.

112.    Elena's goals are unclear as to how they will be measured.

113.    Elena's sight words goal reports a baseline in number of words, but measures progress in percentage accuracy.

114.    Elena's IEP does not provide for integrated speech and language or social skills instruction outside of the speech and language room.

115.    Elena's IEP does not meaningfully describe any research-based direct instruction in academics or social skills.

116.    On November 17, 2021, the District issued a NOREP describing supplemental learning support for 400 minutes per week with an RBT, and speech and occupational therapy services.

117.    The November 17, 2021, NOREP does not describe the reduction of the BCBA hours and the reduction was not discussed at the meeting. Parents did not understand that the hours would be reduced if the IEP were implemented.

118.    Parents obtained an independent educational evaluation ("IEE") from Holly Cohen, a certified school psychologist with thirty years of experience practicing school psychology in the School District of Philadelphia.

119.    Parent sent the IEE to the District on February 17, 2022, shortly after receiving it.

120.    The IEE included information obtained from the Parents, outside providers, and the District; a review of prior test results; a review of the intake from Talk School, school observation on November 29, 2021, testing observation, home observation, cognitive testing, academic achievement testing, adaptive skills rating scales, behavioral rating scales, Autism rating scales and questionnaire, and recommendations.

121.    Ms. Cohen observed Elena in multiple settings including the general education classroom, learning support classroom, speech language therapy, on the playground at school, and at home.

122.    Ms. Cohen found that Elena struggled with any general education instruction even with the support of two adults (a one-to-one and an RBT) and that Elena did not interact with peers in general education at all and was not able to benefit from her general education instruction.

123.    Adaptive rating scales showed that Elena is most competent at home, less competent in learning support, and least competent in general education.

124.    Ms. Cohen observed that Elena displayed interest in one peer, but her play was similar to two-year-old play, such as run and chase and follow.

125.    Elena's abilities observed during one-on-one speech and language therapy were not observed in any other setting.

126.    Elena's ability to maintain attention decreases significantly in the afternoon, as Ms. Cohen found: "As the day wore on in general education she became less and less focused. By the afternoon in general education she could do nothing."

127.    Elena's one-on-one and her RBT did not go into the Learning Support classroom and were not visible to Ms. Cohen when she observed the Learning Support class.

128.    Elena was only able to participate in Learning Support when the teacher directly supported her.

129.    Staff members stated to Ms. Cohen that the day(s) of her school observations were typical days for Elena.

130.    Ms. Cohen opined that Elena's cognitive scores may underestimate her ability based on her observed verbal abilities, her higher academic achievement scores, and her interfering

behaviors.

131.    Based on her evaluation, Ms. Cohen concluded, Elena needs a very consistent program throughout the school day with minimal transitions and integrated speech and language therapy and social skills instruction, and direct academic instruction at her level across the curriculum.

132.    Ms. Cohen opined that the Talk School is appropriate for Elena because it integrates instruction to target language needs, sensory needs, and academic needs. Ms. Cohen spoke with Talk School teachers and reviewed their evaluation of Elena.

133.    Talk School reviewed records, evaluated Elena, and then had Elena attend for a week-long in-class trial to determine whether its program would be appropriate for Elena.

134.    Talk School reviewed, *inter alia*, Elena's medical and educational history and completed observation and testing in speech/language, occupational therapy, and academics.

135.    Talk School provided specific recommendations for how it would address Elena's needs, including language needs, academic needs, behavioral needs, occupational therapy needs, and sensory needs.

136.    Elena demonstrated the ability to learn with the Association Method used at Talk School, a phonics-based multi-sensory, structured, and incremental approach to teaching oral and written language as well as literacy skills, during the one week in class trial.

137.    Talk School recommended DIR/Floortime (Developmental, Individual-differences, and Relationship-based model which addresses emotional and developmental challenges) and a sensory diet for Elena to address her sensory processing needs.

138.    Elena was eager to learn the Talk School peers' names and created bonds with other students in that environment during the one-week trial.

139.    Talk School had multiple providers address Elena's needs at once; for example, an

additional staff member provided continuous pressure and presented Elena with file folders to help her maintain attention during academic demands.

140.    Talk School has five to seven students in a classroom.

141.    On February 23, 2022, Parents requested that the District place Elena at Talk School and the District denied that request in a letter dated February 24, 2022.

142.    The District issued a Permission to Reevaluate for a Review of Records on February 17, 2022. They Family consented.

143.    The District completed a review of records Reevaluation Report, but never shared it with the Family other than shortly before the July 2022 due process hearing.

144.    The IEP team met on March 1, 2022.

145.    Parent understood the March IEP to be describing a change to life skills support.

146.    It was not clear to Parent that the Elena would be receiving both life skills and learning support. At the hearing, the school team testified that Elena was in fact receiving both life skills for 900 minutes per week and learning support for 450 minutes per week.

147.    The IEP document does not state learning support, the Penn Data minutes (a measure of the time that a student is in the regular education classroom) are incorrect, and the description of the placement does not indicate when Elena would attend general education classes.

148.    Parent did not learn until the March IEP meeting that Elena's one-to-one and her RBT were only pushing into the general education classroom and not into learning support.

149.    Parents expressed to the District that Elena requires more carry over of skills, particularly in speech, to other environments in which she was not demonstrating the skills.

150.    The March 2022 IEP still does not acknowledge that Elena has behaviors that impeded her learning; District staff stated that she did.

151.    The March 2022 IEP reiterated information from the June 2021 Evaluation Report (which was completed before Elena transitioned to kindergarten) even though the independent evaluation was available to the IEP team and included up-to-date scores relating to Elena's academic, social, emotional and behavioral functioning.

152.    The IEP only included a minimal update concerning Elena's time on task with no other description of her current, in-school functioning.

153.    The time on task goal does not specify the setting or whether it is with the support of the one-on-one and RBT.

154.    Elena's present level for her recreation and leisure goal only includes input from the June 2021 Evaluation Report.

155.    The IEP did not include any information concerning Elena's performance in the social skills instruction she was receiving.

156.    The District did not produce any behavioral data other than the progress monitoring.

157.    The IEP does not include research-based intervention in math or reading except one vague reference to a program used "across all environments," with no information provided as to what the program addresses and when it is used.

158.    The IEP does not include direct instruction or research-based intervention in social skills.

159.    Despite the evaluation showing that Elena requires minimal transitions throughout her school day, at the end of the 2021-22 school year, Elena was transitioning between different physical locations on multiple floors of the building. For example, on Mondays she would travel from general education, to recess, to occupational therapy, to art, to speech, to learning support, to

lunch, to life skills support, back to general education, then back to learning support, and then back to life skills support again.

160.    The team received the IEE indicating that Elena cannot focus in the afternoon, yet Elena's schedule included three blocks of academic instruction in different environments in the afternoon.

161.    The District admitted that the timing of Elena's academic instruction during the day was made "based on scheduling and where it worked for the schedule" and not based on her needs.

162.    At the hearing, Elena's teachers were unable to explain multiple aspects of Elena's progress monitoring data.

163.    At the time of the hearing, Elena was not on track to meet all her goals.

164.    Elena's goals included skills that she already could complete as of spring 2021.

165.    There is no coordination between the academic instruction that Elena receives in general education, learning support, and life skills support classrooms, and the teachers use three different programs to teach phonics and did not know what the other teachers were doing.

166.    Based on her observation and evaluation of Elena and her many observations of many other life skills classrooms in the School District, Ms. Cohen opined that Elena would not make progress if her program remained as it was, and that life skills support would not be appropriate for her because she can work at a higher level than life skills curriculum.

167.    Ms. Cohen opined that without the integrated and structured small environment that Elena needs "she'll always be playing catchup, [but] she's never going to catch up because [of] her [deficits caused by her] adaptive and her social and her language and her academic needs."

168.    In the May 20, 2022 Due Process Complaint, Parents requested prospective private school placement at Talk School, after Talk's evaluation showed that it could meet Elena's needs

and after Ms. Cohen's evaluation showed that the District's program was not meeting Elena's needs.

169.    Talk School had a spot open for Elena for the 2022-23 school year.

## VIII.   **The Hearing Officer's Errors**

170.    The Plaintiffs incorporate by reference the preceding paragraphs.

171.    Pursuant to the above standards, the District unquestionably failed in its statutory duties to Elena and the Hearing Officer erred in ruling otherwise and in failing to award private school placement as relief.

172.    The Hearing Officer excused the District's inappropriate evaluation despite the fact that it was not timely completed, the occupational therapy assessments needed to be re-administered, the speech evaluation was not completed until after the school year began, and the Functional Behavior Assessment was not completed until months into the school year. The District knew that Elena had needs in each of these areas based on her Early Intervention services and Elena required a comprehensive evaluation and an appropriate IEP before the start of the school year.

173.    The Hearing Officer awarded only 100 hours of compensatory education; however, Elena spent full days without the agreed-upon RBT from the start of the school year to October 25, 2022, the District failed to offer a school-aged IEP before November 2021, and the District admitted that it was not progress monitoring Elena's pendent IEP goals and that her placement in the Autistic Support classroom in the beginning of the 2021-22 school year was not meeting her needs.

174.    Parents raised multiple failures to afford the Parents meaningful parental participation. Despite this, the Hearing Officer did not even mention "parental participation" in the Decision and failed to conclude that the District's actions such as creating IEPs and evaluations without any

parental involvement violated Parents' rights. The District (i) created the June 2021 IEP—including a description of the placement and outside of general education and annual goals—without any parental participation, clearly predetermining the placement; (ii) created two additional NOREPs that described the recommended placement and the discontinuation of occupational therapy services before ever meeting with the Family; (iii) refused to offer an IEP meeting until five days before the start of the school year, which would not afford the Family the 10 days to review the recommended program; (iv) failed to communicate with Parents during the Spring and Summer of 2021; (v) created a reevaluation report and did not share it with Parents; (vi) reduced Elena's BCBA hours in the IEP without any discussion at an IEP meeting, and without describing the change in a NOREP; (vii) did not inform Parents that Elena's RBT and one-on-one were not supporting her inside of the learning support classroom; (viii) provided progress monitoring documents so flawed that the District's witnesses did not even understand them; and (ix) failed to accurately describe the Learning Support/Life Skills Support minutes/placement by documenting only 900 minutes of Life Skills Support and not the additional 450 minutes of Learning Support that Elena was receiving.

175.    The Hearing Officer incorrectly concluded that Elena was provided FAPE from November 2021 through the end of the school year. Elena's IEPs included outdated present education levels; incomprehensible goals, baselines, and progress monitoring; a lack of necessary research-based instruction; a lack of necessary small class size with minimized transitions; a lack of integrated speech and language therapy; a lack of any coordination between the three teachers who were simultaneously teaching Elena reading with three different approaches; and wholly inaccurate description of the programming and placement, including the extent to which Elena would be with her typical peers.

176.    Contrary to Third Circuit precedent, the Hearing Officer incorrectly determined that prospective private school placement is only a remedy when a school district is incapable of educating a student such that the child is affirmatively excluded from school in that district.

177.    Had the Hearing Officer correctly applied the *Burlington-Carter* test, it is clear that the District did indeed deny FAPE, that Talk School was appropriate, and that no equities suggest a reduction or denial of tuition.

178.    The Hearing Officer erred in maintaining jurisdiction over the matter after both parties agreed to an extension of the Decision Due Date. Hearing Officer Cutrona is the only Hearing Officer with first-hand observation of the witnesses in this matter. She was available as of late August or, at latest, early September based on her correspondence in other matters and could and should have decided the matter.

179.    Remarkably, Hearing Officer McElligott did not cite to the record at all in the Decision and did not make any credibility findings. Hearing Officer McElligott did not hear any live testimony or observe any witnesses. The Family's request to have the case decided by Hearing Officer Cutrona, who did personally observe the witnesses, was inappropriately denied.

180.    Moreover, Hearing Officer McElligott's Decision includes several important errors because it did not consider the testimony: for example, he concluded that Elena was only receiving Life Skills Support despite the clear testimony from the District witnesses that she was in fact also receiving 450 minutes of Learning Support, which was not in the IEP. Because Hearing Officer McElligott relied on the District's inaccurate documents and did not consult the testimony, the Decision is fatally flawed.

181.    The substitution of hearing officers denied the Family due process, and the finding that the District provided FAPE must be reversed or, in the alternative, vacated and remanded for

decision by Hearing Officer Cutrona. *See FRCP Rule 63 (*"In a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden."); The requirement that the same judge be present from the time the trial begins accords with the decision in *Commonwealth v. Thompson*, 328 Pa. 27, 195 A. 115 (Pa. 1937). ''The substitution of judges during a case should be carefully guarded and never permitted except under most extraordinary circumstances, and then only when no prejudice can result to the parties. Substitution must be a matter of necessity, where the due administration of justice makes it imperative and without prejudice.'' *Id.* at 28-29*; see also Commonwealth v. Zeger*, 186 A.2d 922 (Pa. Super. 1962). Notably, *Thompson* involved the substitution of judges in a *jury* trial (as opposed to a nonjury proceeding such as the administrative due process hearing here), and the substituted judge took the bench before *any* testimony was taken.

182.    The evidence established that the District violated the ADA for the same reasons that it has violated the IDEA and Section 504, all of which excluded Elena from participation in and denied Elena the benefits of the services, programs, or activities of a public entity and subjected him to discrimination.

**WHEREFORE**, the Plaintiffs respectfully requests that this Court:

1.      Assume jurisdiction over this action;

2.      Hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii); and such additional evidence may include, but not be limited to, the District Court receiving relevant testimony of witnesses upon the request of the plaintiff pursuant to FRCP, Rule 63 due to the improper substitution of hearing officers in the state administrative process;

3.      Independently consider the administrative record without deference to the

administrative agency due to the substitution of hearing officers and (a) reverse the Hearing Officer's decision to the extent that it denies private school placement and denied compensatory education from November 2022 forward; and (b) affirm the Hearing Officer's finding that the District denied FAPE from September 2021 to November 2021, but award additional compensatory education to make the Family whole;

4.     In the alternative, vacate and remand this matter to Hearing Officer Cutrona to make original findings of fact, credibility determinations, and to issue a decision and order;

5.     Order the Defendant to pay Plaintiffs' reasonable attorneys' fees and related costs as the prevailing party below;

6.     Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA, and Pennsylvania law; and

7.     Grant such other relief as this Court deems proper.

Respectfully submitted,

Dennis C. McAndrews, Esquire
PA ID No. 28012

Michael J. Connolly, Esquire
PA ID No. 82065

Jacqueline C. Lembeck, Esquire
PA ID No. 314535

McANDREWS, MEHALICK, CONNOLLY, HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300
Attorneys for Plaintiffs