## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELENA M.**, by and through her Parents, | : | |
| **HANS M.** and **MILDRED M.**, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 22-4767** |
| **SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA**, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

**Perez, J.**                                                                      **March 31, 2025**

On September 1, 2022, a Pennsylvania Special Education Due Process Hearing Officer ("Issuing Officer") issued his Final Decision and Order ("Decision") concerning the educational rights of and remedies available to Elena M. ("Student"), an elementary school student residing within the Philadelphia School District ("District"). *See* ECF No. 8-3. Presently before the Court are the Parties' motions for judgment on the administrative record. For the reasons set forth below, the Court affirms that the District denied Student a free, appropriate public education ("FAPE") from August 2021 to November 2021, reverses the determination that the District provided a FAPE from November 2021 to June 2022, and remands for determination of remedies.

## I.    FACTUAL BACKGROUND

The Court takes these facts primarily from the Decision, ECF No. 8-3, with supplemental cites directly to the administrative record.

1

### A.  <u>Interim Plan (Operative August 31, 2021–November 16, 2021)</u>

Student was diagnosed with autism spectrum disorder in 2020, when she was three years old. ECF No. 8-3 at 5.[1] Student's individualized education program ("IEP") team revised her IEP that July ("Early Intervention IEP"). *Id.* The Early Intervention IEP contained six goals, covering speech and language, motor skills, and attention. *Id.* Student received speech and language, occupational therapy, and behavioral support services. *Id.*

In April 2021, in anticipation of Student's elementary school matriculation, the District requested and received permission from Student's parents, Hans M. and Mildred M. ("Parents"), to evaluate Student. *Id.* at 6. It sought, *inter alia*, speech and language, occupational therapy, and social/emotional and behavioral assessments. ECF No. 8-10 at 64. An occupational therapist evaluated Student that spring and the District generated a Psycho Educational Re-Evaluation Report over the summer. ECF No. 8-3 at 6; ECF No. 8-10 at 82–95.

On June 11, the District generated a proposed IEP. ECF No. 8-3 at 6; ECF No. 8-10 at 101–132. Parents did not receive a copy until July 15, the day after they filed a special education due process complaint. ECF No. 8-18 at 161–62; ECF No. 8-3 at 7; ECF No. 8-11 at 1–4. Parents complained the District was inadequately communicative and had not scheduled a formal IEP meeting or timely issued a notice of recommended educational placement ("NOREP"). ECF No. 8-11 at 3–4. On August 11, Parents and the District executed a mediation agreement establishing an interim plan for the start of the school year ("Interim Plan"). *See id.* at 24.

The Parties agreed Student would "receive comparable services to (the) Early Intervention IEP, pending the IEP team meeting." ECF No. 8-3 at 7. She would participate in "a regular educational environment with the support of a[] . . . registered behavior technician" ("RBT"). *Id.* Student would receive

---

[1] Except where otherwise noted, citations in this opinion refer to the page number stamped atop each page by the ECF/CM system.

autistic support "to address social skills and behavioral needs," as well as speech and occupational therapy. *Id.* at 7–8.

The Interim Plan was in place from the beginning of the school year to November 16, 2021. *See id.* at 8–9; ECF No. 8-11 at 24; ECF Nos. 8-12–8-13. However, the District did not provide an RBT until October 25, and in fact did not start recruiting for the position until after the school year had begun. ECF No. 8-3 at 9; ECF No. 8-17 at 91; ECF No. 8-8 at 140:24-142:7.[2] Additionally, sometime after September 30, Student, at the District's recommendation, switched from autistic support to learning support. *See* ECF No. 8-11 at 38–39.

**B. November 2021 IEP (Operative November 17, 2021–March 3, 2022)**

The District completed Student's comprehensive speech and language evaluation on September 3. ECF No. 8-3 at 8. On September 8, September 20, and October 15, the District's board-certified behavior analyst ("BCBA") observed Student for purposes of her functional behavior assessment ("FBA"). ECF No. 8-20 at 9–10. However, the District did not send Parents the FBA or a positive behavior support plan ("PBSP") until November 24. ECF No. 8-3 at 16; ECF No. 8-14 at 6–10, 11–13. The FBA stated that, despite the presence of a "1:1 staff . . . at all times," Student "refus[ed] to engage in many academic tasks," and "[h]er speech delays . . . imped[ed] her communication in the classroom." ECF No. 8-14 at 10.

On September 14, the District sent Parents a proposed IEP and finalized Re-Evaluation Report. *See* ECF No. 8-18 at 169. The next day, Student's father objected to the proposal and expressed his preference for the Interim Plan. *Id.* at 170.

On September 15, the District requested permission to perform another occupational therapy evaluation. ECF No. 8-3 at 8; ECF No. 8-11 at 31–37. On October 6, the District determined Student was eligible for occupational therapy. ECF No. 8-3 at 8.

---

[2] Citations to hearing transcripts cite to the internal page and line numbers.

On November 12, Student's IEP team met to revise her IEP, which was finalized on November 17 ("November 2021 IEP"). *Id.* at 9; ECF Nos. 8-12–8-13. The November 2021 IEP provided that Student "would spend approximately 76% of the school day in regular education settings." ECF No. 8-3 at 9. The District would provide a one-to-one aide for 1770 minutes per week. *Id.*; ECF No. 8-13 at 31. Student would continue receiving supplemental learning support for 400 minutes per week, as well as speech and language therapy and occupational therapy. ECF No. 8-12 at 5; ECF No. 8-3 at 9. The November 2021 IEP contained twelve goals, covering speech and language, reading, social skills/socialization, occupational therapy, attention, self-advocacy, and mathematics. ECF No. 8-3 at 9. Student's formal progress monitoring report measured her progress under the November 2021 IEP on reporting dates of November 22, 2021, and February 2, 2022. ECF No. 8-17 at 93–105.

### C.  Parents' Independent Evaluation (Conducted October 2021–December 2021)

Meanwhile, Parents took steps to address what they viewed as deficiencies in the District-provided education. In late October 2021, they contacted a private evaluator with concerns that the District was not meeting Student's educational needs and began investigating alternative schooling options, including the private Talk School. ECF No. 8-8 at 73:12–76:17, 183:18–184:7.

Student visited the Talk School twice in early November for an initial screening and placement evaluation. ECF No. 8-3 at 9. She attended classes during a weeklong trial placement from December 6 to December 10. *Id.* at 10; ECF No. 8-14 at 14. The Talk School issued a report containing speech and language and occupational therapy recommendations. ECF No. 8-3 at 13. While the report did not include academic recommendations, it detailed her academic performance during her trial placement. *Id.* at 13–14; ECF No. 8-14 at 26–28. The Issuing Officer determined the report contained no information about the school or its programming; however, it did reference specific academic activities and the Association Method of instruction. ECF No. 8-3 at 13; ECF No. 8-14 at 27.

According to the private evaluator, whose credibility the Issuing Officer did not assess, the Association Method is "a multisensory approach to teaching oral/written language and literacy. This

curriculum immerses the students in speech and language through every aspect of their school day." ECF No. 8-14 at 51. The Talk School provides students with "9.5 hours of speech/language intervention"—a combination of individual sessions with a speech and language therapist and language generalization activities in the classroom—over an unspecified time period. *Id.* at 51–52. The Talk School offered Student placement contingent upon the presence of a one-to-one educational aide. *Id.* at 35.

The private evaluator observed Student at the District on November 29 and 30. ECF No. 8-3 at 10; ECF No. 8-14 at 55, 57.

In mid-February 2022, Parents sent the evaluator's report to the District and requested that it fund Student's placement at the Talk School. ECF No. 8-3 at 10. The District declined to fund private school placement, but sought permission to review the private evaluator's report and incorporate it into a formal District Re-Evaluation Report. *Id.*

**D.** **March 2022 IEP (Operative March 4, 2022–End of School Year, 2022)**

The District generated the Re-Evaluation Report, which "contained much of the content from the private evaluation report," on February 24, 2022. *Id.* at 11; *see also* ECF No. 8-14 at 37–88, 113–128. Student's IEP team met on March 1 to revise her IEP. ECF No. 8-3 at 11; ECF No. 8-17 at 1. The District finalized her IEP on March 4 ("March 2022 IEP").

The March 2022 IEP provided that Student would spend "approximately 51% of the school day in regular education settings." ECF No. 8-3 at 12. The District would provide a one-to-one aide for 1770 minutes per week. *Id.*; ECF No. 8-17 at 67. The March 2022 IEP indicated Student would be moved from supplemental learning support to life skills support, but was accompanied by a NOREP clarifying Student would receive 450 minutes per week of learning support in addition to 900 minutes per week of life skills support ("March 2022 NOREP"). ECF No. 8-3 at 12; ECF No. 8-17 at 91. Student would continue speech and language therapy and occupational therapy. ECF No. 8-3 at 12. The March 2022 IEP contained twelve goals, covering speech and language, reading, mathematics, social skills/socialization, occupational therapy, behavior, and self-advocacy. *Id.*

5

## II. <u>PROCEDURAL HISTORY</u>

Parents returned the March 2022 NOREP commenting, "I approve this IEP as written. However, the overall plan continues to be a denial of FAPE. I am requesting placement at another school." *Id.* at 12–13. Parents requested a due process hearing. *Id.* at 13.

On May 20, 2022, Parents filed a due process complaint alleging the District denied Student a FAPE under the Individuals with Disabilities in Education Improvement Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), and the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and seeking compensatory education for the District's denial of FAPE and placement at the Talk School. ECF No. 8-21 at 1–7. A hearing officer ("Original Officer") asserted jurisdiction over the matter, managed the prehearing process, and presided over hearing sessions on July 20, 21, and 26, 2022. ECF No. 8-3 at 3. The original decision due date was August 29. *Id.*

On August 26, the Original Officer fell ill. *Id.* On August 28, the Issuing Officer asserted jurisdiction and extended the decision due date to September 1. *Id.* at 4. On August 31, Plaintiffs requested that jurisdiction be returned to the Original Officer to issue the final decision, as she "heard the original, live testimony. Procedurally and substantively, [Plaintiffs] [felt] personal observation of the witnesses by the factfinder [was] critical in this case." ECF No. 8-9 at 1. The Original Officer declined to reassert jurisdiction. *Id.*

On September 1, the Issuing Officer issued the Decision, in which he concluded that from August to November 2021, the District denied Student FAPE under the IDEA and Section 504. ECF No. 8-3 at 16–17, 19. First, the District completed its FBA observations of Student in September and October 2021, but inappropriately delayed issuance of the FBA until November. *Id.* at 16. Second, the IEP team met before the FBA was issued, and therefore could not consider it at its November meeting. *Id.* at 16–17. Finally, "the record is devoid of any data[,] . . . assessments[,] or formal progress monitoring" under the Interim Plan. *Id.* at 17. The Issuing Officer awarded Student one hundred hours of compensatory education—fifty hours each for the FBA delay and the lack of any progress monitoring. *Id.* at 20–22.

In contrast, the Issuing Officer concluded that from November 2021 to June 2022—under the terms of the November 2021 and March 2022 IEPs—the District provided FAPE:

> [S]tudent made meaningful education progress through the goals in those IEPs. In only a handful of goals . . . was there a lack of progress . . . . There were some goals from the November 2021 IEP where there appears to be no data. But considered all together, the progress monitoring supports a conclusion that [S]tudent was making progress across almost all IEP goals over the period November 2021–June 2022. In an encouraging sign, after [Student's] placement was moved from learning support to life skills support in the March 2022 IEP, [her] progress in many goal areas . . . markedly strengthened.

*Id.* at 15. As such, the Issuing Officer declined to order prospective private school placement. *Id.* at 17–19.

On November 30, Plaintiffs filed the instant action, bringing claims under the IDEA; Section 504; the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); and Pennsylvania Code Chapters 14 and 15, 22 Pa. Code §§ 14.101, 15.1 ("Chapter 14" and "Chapter 15").[3] ECF No. 1 at ¶ 2. Presently before the Court are the Parties' motions for judgment on the administrative record, ECF Nos. 21 and 22.

Plaintiffs request the Court: (1) affirm the Issuing Officer's conclusion that the District denied Student a FAPE from August 2021 to November 2021; (2) award additional compensatory education for this time period; (3) reverse the Issuing Officer's denial of compensatory education beyond November 2021; and (4) reverse his denial of private school placement. ECF No. 21-1 at 36. Alternatively, Plaintiffs request the Court vacate the Decision to the extent it denies relief beyond November 2021 and remand this matter to the Original Officer for fact-finding, credibility determinations, and a new decision and order. *Id.* Plaintiffs also seek attorneys' fees and costs. *Id.*; ECF No. 27 at 10. The District requests the Court affirm the Decision and dismiss Plaintiffs' claims with prejudice. ECF No. 22 at 29.[4]

---

[3] Chapter 14 incorporates and implements the IDEA; Chapter 15 implements Section 504. *A.W.*, 2015 WL 390864, at *10, *15.

[4] Citations to ECF No. 22 refer to the document's internal page number.

## III. JURISDICTION

This Court has jurisdiction to review the Decision under 20 U.S.C. § 1415(i)(2). *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015); *see also* 22 Pa. Code § 14.162(o). Further, it has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" under 28 U.S.C. § 1331, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

A plaintiff must exhaust a non-IDEA claim through the IDEA's administrative process "if the . . . gravamen . . . of the non-IDEA claim relates to the denial of a FAPE" and she seeks relief available under the IDEA. *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 974, 979 (3d Cir. 2024) (citing *Fry v. Napolean Community Schools*, 580 U.S. 154, 170–71 (2017); *Perez v. Sturgis Public Schools*, 598 U.S. 142, 147 (2023)). This "exhaustion requirement is jurisdictional." *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 13-2379, 2015 WL 390864, at *16 (M.D. Pa. Jan. 28, 2015) (citing *James S. ex rel. Thelma S. v. Sch. Dist. of Phila.,* 559 F. Supp. 2d 600, 616 (E.D. Pa. 2008)). Plaintiffs raise an ADA violation for the first time in the Complaint, alleging that "the District violated the ADA for the same reasons that it has violated the IDEA and Section 504"—*i.e.*, a FAPE denial. ECF No. 1 at ¶ 182. Compensatory education and prospective private school placement are available under the IDEA. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996); *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990). Accordingly, the Court dismisses Plaintiffs' ADA claim with prejudice for lack of subject matter jurisdiction.

## IV. STANDARD OF REVIEW

A court reviewing an administrative decision under the IDEA "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). In other words, "the reviewing court is obliged to conduct a modified *de novo* review, giving 'due weight' to the underlying administrative proceedings." *S.H. v. State-*

*Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (quotations omitted). "Due weight" requires the reviewing court to consider "[f]actual findings from the administrative proceedings . . . to be . . . *prima facie* correct," *id.* (citation omitted), and to "accept . . . credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995), *as amended* (Oct. 24, 1995)) (emphasis in *Shore Reg'l*). As such, the court must explain any departure from administrative factfinding. *S.H.*, 336 F.3d at 270. And it may not "substitute its own notions of sound educational policy for those of local school authorities." *Id.* (quotations omitted). Still, the "court exercises *de novo* review over legal conclusions," *Colonial Sch. Dist. v. N.S.*, No. 19-1311, 2020 WL 1517562, at *8 (E.D. Pa. Mar. 30, 2020) (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)), including awards "for compensatory education and tuition reimbursement[.]" *Lauren G. ex rel. Scott G. v. W. Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 385 (E.D. Pa. 2012) (quoting *P.P. v. W. Chester Area Sch. Dist.,* 585 F.3d 727, 735 (3d Cir. 2009)).

Plaintiffs ask this Court to discard administrative deference because the Issuing Officer "had no opportunity to observe live testimony and determine the credibility and weight to be accorded to the various witnesses, testimony, and relevant exhibits." ECF No. 21-1 at 21. They argue the Issuing Officer reached incorrect factual conclusions and "missed critical issues because he relied on inaccurate documents and did not consult the testimony which showed the documents were unreliable." *Id.* at 24–25.

This Court rejects Plaintiffs' entreaty to disregard the plain language of the IDEA and binding case law. It will grant the Decision "due weight," as required. *See S.H.*, 336 F.3d at 270. In preparing the Decision, the Issuing Officer "reviewed the complaint, the exhibits of record, . . . the transcripts," and "the parties' closing statements." ECF No. 8-3 at 4. He supported his factual findings with citations to the record. *See generally id.* While it is true the Issuing Officer did not observe live testimony, "hearing testimony in person is not a *sine qua non* for weighing evidence." *Bd. of Educ. of Lake Forest High Sch. Dist. 115 v. Illinois State Bd. of Educ.*, No. 19-04475, 2020 WL 1467418, at *6 (N.D. Ill. Mar. 26, 2020). And the

Issuing Officer did, in fact, weigh the evidence, preferring to establish findings of fact "without reference to the transcript, . . . given the procedural history" of this case. ECF No. 8-3 at 5. To assess Student's progress under the IEPs, the Issuing Officer determined the District's formal progress monitoring report "provides a more reliable" and "accessible . . . picture of the student's progress or lack of progress" than the "qualitative reflections of educators." *Id.* at 11–12. The Court will adhere to the modified *de novo* standard, explaining any departures from the Issuing Officer's factual conclusions and justifying any disagreement with his credibility determinations.

The Third Circuit has "decline[d] to extend [modified *de novo*] review to claims under . . . Section 504." *Le Pape*, 103 F.4th at 983. Accordingly, courts within the Third Circuit have reviewed these claims *de novo*. *See T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 598 (3d Cir. 2014); *K.N. v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019).

Finally, "the party challenging the administrative decision bears the burden of persuasion[.]" *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (citations omitted).

## V.  **DISCUSSION**

Plaintiffs challenge the Issuing Officer's conclusion that the District provided Student a FAPE from November 2021 to June 2022. As a remedy, they seek compensatory education and prospective private school placement. The District, for its part, seeks affirmance of the Decision. As such, this Court will review the Decision with respect to the provision of FAPE from November 2021 to June 2022.

Neither Party disputes that the District denied Student a FAPE from August 2021 to November 2021.[5] But Plaintiffs argue this Court should increase Student's compensatory education hours for this time

---

[5] The District contends that "Plaintiffs are not entitled to any compensatory education hours—let alone additional hours," ECF No. 22 at 25, implying that it objects to the compensatory education Plaintiffs *were* granted to remedy the denial of FAPE from August 2021 to November 2021. However, the District only advances arguments about the administration of FAPE after November 2021. *See, e.g.*, ECF No. 22 at 20 ("The Hearing Officer Correctly Determined that Plaintiffs Failed to Sustain Their Burden of Establishing that Student was Denied a [FAPE] from November 2021 through the End of the 2021–2022 School Year").

period on additional grounds. Accordingly, the Court will also review the grounds upon which the Issuing Officer found a denial of FAPE from August 2021 to November 2021.

### A. Provision of FAPE

The District must provide Student a FAPE under the IDEA and Section 504. *Lauren G.*, 906 F. Supp. 2d at 387 (citing 20 U.S.C. § 1412(a)(1); 29 U.S.C. § 794(a)). "[A] party may use the same conduct as the basis for claims under" both statutes. *Id.* at 388 (quoting *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation,* 490 F.3d 337, 349 (3d Cir. 2007)).

### 1. IDEA

The IDEA defines "FAPE" as:

> special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the [IEP] required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "Related services" include "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education[.]" *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 246 (3d Cir. 2009) (quoting 20 U.S.C. § 1401(26)(A)).

The IEP is "the primary vehicle for providing each child with the promised FAPE." *Upper Darby Sch. Dist. v. K.W.*, No. 22-04343, 2023 WL 4826736, at *6 (E.D. Pa. July 27, 2023), *aff'd sub nom. Upper Darby Sch. Dist. v. K.W. Through T.B.,* No. 23-2650, 2024 WL 3811990 (3d Cir. Aug. 14, 2024) (quoting *Fry*, 580 U.S. at 158). When reviewing a FAPE challenge, a district court "must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was reasonably calculated to enable the child to receive educational benefits." *D.S.*, 602 F.3d at 564 (quoting *Mary T.,* 575 F.3d at 249). "The first question deals with the procedures used to develop and implement the IEP . . . . The second question relates to the substantive requirements of the

IEP[.]" *Johnson v. Lancaster-Lebanon Intermediate Unit 13, Lancaster City Sch. Dist.*, 757 F. Supp. 606, 615 (E.D. Pa. 1991).

    i. <u>Procedure</u>

  The IDEA's IEP procedures comprise "written notice, parent consent, evaluation and review of documents, and development of an IEP in conjunction with school staff and parents[.]" *Montgomery Cnty. Intermediate Unit No. 23 v. A.F. by and through his Parents D.F. and J.F., et al.*, 506 F. Supp 3d 293, 304 (E.D. Pa. 2020) (quoting *T.R. v. Sch. Dist. of Philadelphia*, No. 15-4752, 2019 WL 1745737, at *1 (E.D. Pa. Apr. 18, 2019)).

  "The IDEA requires a 'full and individual' evaluation before the initial provision of special education services." *A.W.*, 2015 WL 390864, at *11 (quoting 20 U.S.C. § 1414(a)(1)(A)). "After obtaining [parental] consent, the district must conduct the evaluation and issue an evaluation report within sixty calendar days, excluding any days during the summer." *Id.* (citing 20 U.S.C. § 1414(a)(1)(C)(i); 22 Pa. Code § 14.123(b)).

  An IEP must contain "a statement of the special education and related services . . . to be provided to the child" and state "[w]hen periodic reports on the progress the child is making toward meeting [their] annual goals . . . will be provided[.]" 20 U.S.C. § 1414(d)(1)(A)(i). The IEP team must "revise[] the IEP as appropriate to address," *inter alia*, "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate[.]" 20 U.S.C. § 1414(d)(4)(A)(ii).

  "[A]lthough it is important that a school district comply with the IDEA's procedural requirements, compliance is not a goal in itself; rather, compliance with such procedural requirements is important because of the 'requirements' impact on students' and parents' substantive rights.'" *Ridley*, 680 F.3d at 274 (quoting *D.S.*, 602 F.3d at 565). Accordingly, "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565 (citing *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 525–26 (2007)); *see also* 34 C.F.R. § 300.513(a)(2).

"[S]chool districts must ensure that parents are meaningfully involved in the decision-making process and the creation of their child's [IEP]." *Montgomery Cnty.*, 506 F. Supp. 3d at 297; *see also* 20 U.S.C. § 1414(e) ("Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."). "[M]eaningful participation requires a reasonable degree of understanding to allow parents to make an informed decision about their child's education." *Montgomery Cnty.*, 506 F. Supp. 3d at 309 (collecting cases). As such, discrepancies between services listed in an IEP and those actually provided are actionable as procedural deficiencies, because they prevent parents from accurately assessing the IEP's appropriateness. *Cf. Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 128 (3d Cir. 2011) (inadequate description of transition services is a procedural violation) (citing *Bd. of Educ. v. Ross,* 486 F.3d 267, 276 (7th Cir. 2007)). Moreover, "the lack of content in an IEP as it relates to the notice parents receive about their child's proposed education . . . implicate[s] [the IEP's procedural] requirements." *Montgomery Cnty.*, 506 F. Supp. 3d at 306 (citing 20 U.S.C. § 1414(e)) (collecting cases). However, "information contained in NOREP letters can supplement the information missing from an IEP regarding services that a child will receive," particularly where they "include[] not just the programming but the amount of time that would be devoted to such programming." *Id.* at 309, 310 (citing *Ridley*, 680 F.3d at 274–75).

> a.  *The District's Procedural Failures Denied FAPE from August 31, 2021 to October 25, 2021*

Plaintiffs argue the District generally excluded Parents from the IEP drafting process in the spring and summer of 2021. ECF No. 21-1 at 31–32. They contend the District's failure to provide Student with the required IEP before the start of the school year and delay of Student's initial evaluations denied her a FAPE by disrupting her transition from early intervention to school-aged services. *Id.* at 28. The Issuing Officer concluded the absence of a formal IEP and the District's delay in administering occupational therapy and speech and language evaluations were not "problematic." ECF No. 8-3 at 16. Nor was the five-week delay between issuance of her occupational therapy reevaluation and the November 2021 IEP meeting. *Id.*

13

Procedurally, Parents are correct that they are entitled to participate in the IEP drafting process, and Student was entitled to a comprehensive evaluation and an IEP by the start of her kindergarten year. *See* 20 U.S.C.A. § 1414(d)(2)(A). Parents consented to the District's request to reevaluate Student on April 12, 2021, triggering the District's sixty-day deadline to conduct the required evaluations. ECF No. 8-10 at 66. The District missed this deadline for the speech and language assessments. However, the Parties resolved the District's failures preceding the 2021–22 school year via mediation, agreeing to begin the year under the Interim Plan.

But the mediation did not address subsequent events, and the District delayed Students' speech and language evaluations after the school year began on August 31, 2021. Even so, this Court affirms the Issuing Officer's conclusion that the District's three-day delay in issuing her speech and language evaluation report did not amount to a denial of FAPE. Nor did the five-week delay between the issuance of an updated occupational therapy report and the November 2021 IEP meeting. Student was, after all, receiving both speech and language and occupational therapy support under the Interim Plan approved by Parents.

This Court disagrees with the Issuing Officer's finding that the District's failure to provide an RBT until October 25 did not deny Student a FAPE. This failure deprived Student of the benefits of personalized behavioral support explicitly provided by the Interim Plan. The Issuing Officer does not explain why this failure was not "problematic." ECF No. 8-3 at 16. But the record shows the District could not address Student's needs in the general education classroom without an RBT, and her general education teacher occupied her with "busy work" instead. ECF No. 8-7 at 273:12–16; ECF No. 8-8 at 140:16–23, 143:1–144:1.

        b.  *The District's Procedural Failures Denied FAPE from November 17, 2021, to End of School Year, 2022*

Plaintiffs argue the District deprived Parents of their right to meaningfully participate in drafting the November 2021 IEP because the District failed to inform them of a reduction in Student's BCBA hours at the IEP meeting or in a NOREP. ECF No. 21-1 at 32. But Plaintiffs reviewed and rejected a proposed

IEP, provided input, and attended an IEP meeting. Accordingly, Parents "had an opportunity to participate in the IEP formulation process in a meaningful way." *See Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993) (finding no denial of parental participation rights where parents were presented with a draft IEP, suggested revisions to the IEP, and attended an IEP meeting, even though parents were ultimately dissatisfied with the revised IEP).

Similarly, Plaintiffs argue the March 2022 IEP was procedurally deficient because it only documented Student's projected life skills support, omitting the additional learning support that she actually received. ECF No. 21-1 at 32. But the accompanying NOREP clarified Student would receive both, ECF No. 8-17 at 78, so Parents' substantive rights were not affected. *See Ridley*, 680 F.3d at 275.

The Court credits Plaintiffs' argument that the November 2021 IEP was procedurally deficient because it failed to properly implement a required service. The IEP required a one-to-one aide to assist Student outside the regular education classroom, characterizing this service as necessary for Student "to benefit from or access her special education program[.]" ECF No. 8-13 at 31; *see also* ECF No. 8-12 at 8 (requesting temporary support from a special education assistant during Student's "content classes and specials"). But at the March 1, 2022 IEP meeting, Parents learned the District was only providing Student with one-to-one support in the general education classroom—not in her special education classes. ECF No. 21-1 at 16, 32. "[W]ithout clear communication from the [District] regarding the services they wished to offer, there was simply no way for Parents to determine whether the education offered was actually appropriate." *Montgomery Cnty.*, 506 F. Supp. 3d at 309. This discrepancy deprived Parents of a clear understanding of the services Student was to receive under the November 2021 IEP. And the absence of a one-to-one aide outside the general education classroom prevented Student from—in the District's own words—benefitting from or accessing her special education program.

Finally, Plaintiffs contend both IEPs deprived Parents of their meaningful participation rights because the "progress monitoring documents . . . were so flawed that the District's witnesses could not explain them." ECF No. 21-1 at 32. The IDEA does not set standards for progress monitoring. *Coleman v.*

*Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 572 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014) (explaining "a 'sub par' progress monitoring scheme" did not deny FAPE because the plaintiffs "failed to point to a procedural requirement under the IDEA, or its implementing regulations, that relates to the necessity of progress monitoring"). But the IEP team must "revise the IEP as appropriate to address . . . any lack of expected progress toward the annual goals[.]" 20 U.S.C. § 1414(d)(4)(A)(ii). A preponderance of the evidence shows the IEP team could not have appropriately addressed Student's lack of progress when revising her IEP in March 2022 because several members—including, at least, Parents, Student's special education teacher, and her occupational therapist, *see* ECF No. 8-17 at 2—did not understand the progress monitoring report.

The report included so-called "reporting percents" for each annual goal on set "reporting dates." *See, e.g.*, ECF No. 8-17 at 93. A few of the goals were recorded as "not introduced" by one or more reporting dates. *See, e.g., id.* at 94, 95. "Goal progress graphs" tracked Student's progress by "session number." *See generally id.* at 93–134. The Issuing Officer judged the progress monitoring report to be the most "reliable" and "accessible" source of Student's progress. ECF No. 8-3 at 11.

According to the Decision, between the reporting dates of November 22, 2021, and February 2, 2022, Student made progress in two speech and language goals, one reading goal, and the attention, self-advocacy, and mathematics goals. ECF No. 8-3 at 11 (citing ECF No. 8-12 at 25–ECF No. 8-13 at 30; ECF No. 8-17 at 93, 94, 97, 98, 101, 103–04). But based on reporting percents, Student showed no progress towards her annual goal of accurately responding to information presented orally by independently asking and answering questions about key details. ECF No. 8-17 at 101 (0% on both reporting dates). While the goal progress graph listed two consecutive session scores of twenty-two and fifty, the goal was to be measured by percent accuracy over *three* consecutive sessions. *Id.* Also based on reporting percents, Student regressed on her long-term goal of producing four- to six-word utterances meeting certain grammatical standards. *Id.* at 103 (decrease from 12% to 0% on reporting dates). The goal progress graph

listed four consecutive session scores, but the goal was to be measured by percent accuracy over *five* consecutive sessions. *Id.* at 103–04.

The Decision also states Student made no progress on one speech and language and one reading goal. ECF No. 8-3 at 11 (citing ECF No. 8-12 at 25–ECF No. 8-13 at 30; ECF No. 8-17 at 96, 102). However, it would be more accurate to say she regressed on her long-term goal of independently identifying places and common objects when interacting with others. ECF No. 8-17 at 102 (decrease from 54% to 0% on reporting dates). And Student slightly improved on her long-term goal of sounding out and verbally blending letters. *Id.* at 96 (increase from 0% to 3% on reporting dates).

Finally, the Issuing Officer determined that no data were reported for one speech and language goal, two social skills/socialization goals, or the occupational therapy goal. ECF No. 8-3 at 11 (citing ECF No. 8-12 at 25–ECF No. 8-13 at 30; ECF No. 8-17 at 95, 99, 100, 105). Three of these goals were "not introduced" during the reporting period. However, there were data for Student's long-term goal of approaching her peers to appropriately interact—they simply showed no progress. ECF No. 8-17 at 105 ("[n]ot introduced" before first reporting date, but 0% on second reporting date).

The report, on its face, contradicts the Decision, so this Court will not defer to the Issuing Officer's factual conclusions about Student's progress. And although the Issuing Officer "preferred" to establish findings of fact without reference to the transcript, this Court must seek guidance in interpreting the report from other portions of the record. Unfortunately, District personnel were unable to shed light on how to read the reports. Student's special education teacher did not know the origin of the numerical baseline performance scores for each annual goal, against which all of Student's progress was to be measured. ECF No. 8-7 at 307:18–310:5. Student's occupational therapist was unsure what zero percent progress indicated and what the "not introduced" goal designation meant. ECF No. 8-6 at 448:10–25, 450:4–8. The session numbers listed on the *x* axis of the goal progress graphs did not correspond to the number of actual sessions directed towards that goal. *Id.* at 465:21–466:11, 499:12–17. Moreover, the graphs may have reflected

Student's performance on short-term objectives, rather than her progress towards the annual goal. *Id.* at 498:13–499:11, 500:17–501:7.

To be sure, the absence of any statutory or regulatory progress monitoring standards means that none of these deficiencies, on its own, qualifies as a procedural violation. But the record shows Student's IEP team members could not discern her progress from the report. And it would defy common sense to hold that they could nevertheless appropriately consider any lack of expected progress towards Student's annual goals when revising her IEP. Parents were deprived of their right to meaningfully participate in drafting Student's March 2022 IEP because they could not decipher a progress report that confounded both the District and the Issuing Officer.

In sum, the District denied Student a FAPE from November 17, 2021, to March 3, 2022, by failing to implement the November 2021 IEP's one-to-one services outside the general education classroom. It denied Student FAPE from March 4, 2022, to the end of the school year by failing to consider Student's lack of progress when revising Student's IEP.

ii.  Substance

An "IEP must be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Shore Reg'l*, 381 F.3d at 198 (quoting *Polk v. Cent. Susquehanna Interm. Unit 16,* 853 F.2d 171, 181 (3d Cir. 1988)); *see also S.H.*, 336 F.3d at 271. An IEP provides meaningful educational benefits when it offers the student an opportunity to make behavioral, social, and emotional progress. *Breanne C. v. S. York Cnty. Sch. Dist.,* 732 F. Supp. 2d 474, 483 (M.D. Pa. 2010) (citing *M.C.*, 81 F.3d at 394). "'[T]he provision of merely more than a trivial educational benefit' is insufficient." *D.S.*, 602 F.3d at 556 (quoting *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)). But "[d]istricts need not provide the optimal level of services, . . . since the IEP required by IDEA represents only a 'basic floor of opportunity.'" *Carlisle*, 62 F.3d at 533–34 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 201 (1982)).

"[U]nder the IDEA, courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student." *Ridley*, 680 F.3d at 277 (citing *D.S.,* 602 F.3d at 556–57; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 247 (3d Cir. 1999), *superseded by statute on other grounds*; 71 Fed. Reg. 46,540, 46,664–65). "[P]arents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student." *T.L. v. Lower Merion Sch. Dist.*, No. 15-0885, 2016 WL 3405453, at *17 (E.D. Pa. June 20, 2016) (quoting *W.H. v. Schuylkill Valley Sch. Dist.*, 954 F. Supp. 2d 315, 324 (E.D. Pa. 2013)).

Additionally, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995) (quoting *Fuhrmann*, 993 F.2d at 1040). Accordingly, the court "should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." *D.S.*, 602 F.3d at 565 (citing *Susan N.,* 70 F.3d at 762). "[S]o long as the IEP responds to the [student's] needs, its ultimate success or failure cannot retroactively render it inappropriate." *Carlisle*, 62 F.3d at 534.

### a. *The District Substantively Denied FAPE from August 31, 2021 to November 24, 2021*

This Court affirms that the District denied Student a FAPE from the beginning of the school year until November 24, 2021, when it issued Student's FBA and PBSP. ECF No. 8-3 at 16–17. "A school district denies a student a FAPE if it fails to address the student's 'behavioral problems in a systematic and consistent way.'" *Colonial v. N.S.*, 2020 WL 1517562, at *14 (quoting *Lauren P. ex rel. David & Annmarie P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552, 554–55 (3d Cir. 2009)). As such, "a school's failure to develop a [PBSP] can result in the denial of a FAPE." *Id.* (citing *G.D. v. Wissahickon Sch. Dist.*, 832 F Supp. 2d 455, 467 (E.D. Pa. 2011)). Here, neither the Interim Plan nor the November 2021 IEP systematically addressed Student's known behavioral challenges, as they predated the PBSP. Therefore, until November 24, the District did not provide Student the opportunity to make behavioral, social, and emotional progress. *See Upper Darby*, 2023 WL 4826736, at *7.

19

The Issuing Officer held the District substantively denied Student a FAPE until the November 2021 IEP was in place by failing to monitor Student's progress towards the Interim Plan goals. ECF No. 8-3 at 17, 21–22. He does not directly explain how the District's *post hoc* failure to monitor rendered the Interim Plan unsuitable at the time it was created. But he infers from the complete lack of any documentation of Student's performance that the District had no intention of tracking Student's progress until the November 2021 IEP was in place. *See* ECF No. 8-3 at 22 ("If there are data, or assessments, or progress-monitoring . . . it played no role in the evidence at the hearing. . . . [I]t appears the District was content to simply wait until its IEP was in place."). The Court will credit this factual inference and affirm that the Interim Plan was not reasonably calculated to confer any meaningful educational benefit on Student.

b. *The District Did Not Substantively Deny FAPE from November 25, 2021–End of School Year, 2022*

The Decision states that, on balance, "the progress monitoring supports a conclusion that the student was making progress across almost all IEP goals over the period November 2021–June 2022." ECF No. 8-3 at 15. Additionally, "after the student's placement was moved from learning support to life skills support in the March 2022 IEP, the student's progress in many goal areas . . . markedly strengthened." *Id.*[6] The Court will not affirm on these grounds, which are impermissibly retrospective. *See Colonial Sch. Dist. v. G.K. by & through A.K.*, No. 17-3377, 2018 WL 2010915, at *11 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019) ("[I]t cannot be determined whether an IEP was appropriate solely by evaluating a child's progress or lack of progress under that IEP.").

Plaintiffs assert the District denied Student a FAPE because the IEPs contained outdated present education levels, inadequate goals, insufficiently small class sizes, too many classroom transitions, no integrated speech and language therapy, inappropriate special education placements, and insufficient research-based instruction. ECF No. 21-1 at 29, 30. The Court disagrees.

---

[6] This factual conclusion is incorrect, as Student received both life skills and learning support under the March 2022 IEP and NOREP. *See supra*, Part I.D.

The record shows Student's November 2021 IEP present education level statements were based on her most recent formal evaluations. The bulk of these were conducted prior to kindergarten. *See* ECF No. 8-13 at 6–8, 9–11 (behavior), *id.* at 12–13 (interpersonal communication), *id.* at 14–17, 19–22, 23–26, 27–30 (functional academics). However, Student's speech and language statements reflected the speech and language pathologist's September 2021 assessment, ECF No. 8-12 at 26–27, 29–30, 32–33, 35–36, and her motor skills statements incorporated her October 2021 occupational therapy reassessment. *Id.* at 38–ECF No. 8-13 at 4. Similarly, the March 2022 IEP statements included speech and language pathologist, occupational therapist, and special education teacher input from February 2022. ECF No. 8-17 at 24–26, 28–30, 31–33, 34–36, 37, 48, 53, 58, 63. Her recreation and leisure statement identified her strengths and needs as observed during kindergarten. *Id.* at 65.

Plaintiffs mount an additional challenge against the March 2022 IEP statements for not reflecting the independent evaluator's observations from November 2021. ECF No. 21-1 at 30. But they fail to meet their burden to establish that the District's decision to rely on the assessments and observations of Student's long-term educators, as opposed to an outside evaluator who observed Student over two days, was not reasonably calculated to confer a meaningful benefit on Student.

Plaintiffs contend the IEPs denied Student a FAPE because her "incomprehensible" goals "could not be accurately measured." ECF No. 21-1 at 30, 14.[7] But each goal was capable of objective measurement and the IEPs clearly described whether it would be measured as a percentage or an absolute number. *See*

---

[7] While the IDEA imposes procedural standards for measurable goals, "[t]he Third Circuit has determined that a dispute about the specific contents of an IEP is a substantive claim." *Coleman*, 983 F. Supp. 2d at 573 (citing *D.S.*, 602 F.3d at 565). To the extent a lack of "objectively measurable goals" is "a procedural error," *Rodrigues*, 458 F. App'x at 127; *see also* 20 U.S.C. § 1414(d)(1)(A), this Court finds the IEPs' baselines and goals were procedurally sound. They contained lengthy statements of Student's present levels of functioning. ECF 8-12 at 26–27, 29–30, 32–33, 35–36; ECF No. 8-12 at 38–ECF No. 8-13 at 4; ECF No. 8-13 at 6–8, 8–11, 12–13, 14–17, 19–22, 23–26, 27–30; ECF No. 8-17 at 24–26, 28–30, 31–33, 34–36, 37, 39–41, 42–43, 45–48, 50–53, 55–58, 60–63, 65. While Plaintiffs are correct that the goals did not explicitly indicate whether Student would perform the goal behavior with support from an educator, and that their numerical baselines and progress measurements were not always reported in the same units, ECF No. 21-1 at 14, Plaintiffs "have failed to point to a procedural requirement under the IDEA, or its implementing regulations," requiring this level of detail. *Cf. Coleman*, 983 F. Supp. 2d at 565.

*generally* ECF No. 8-12–ECF No. 8-13; ECF No. 8-17. To say the goals could not be accurately measured "is a mischaracterization of the evidence. It would be more accurate to say that [Parents] had an affirmative belief that progress was measured inadequately." *G.K.*, 2018 WL 2010915, at *13. But they fail to explain how the goals—targeted towards Student's academic, motor, and behavioral functioning—were not reasonably calculated to confer a meaningful benefit on Student.

Some of Plaintiffs' specific grievances arise out of the District's decision not to follow all of the independent evaluator's recommendations. They allege the IEPs should have provided small, structured, and consistent classes with minimal classroom transitions and integrated speech and language therapy throughout Student's school day. ECF No. 21-1 at 15, 30. These objections fail for three reasons. First, the District did not receive the evaluator's report until February 2022, months after implementing the November 2021 IEP. Thus, the evaluation cannot serve as a basis for concluding the November 2021 IEP was deficient at the time it was created. Second, Plaintiffs do not explain how the evaluator, based on a few days of observation, assessed Student's needs more credibly than the District and her direct educators. Notably, only three full school days elapsed between the implementation of the November 2021 IEP and the evaluator's first observation. ECF No. 26 at 8–9.[8] In contrast, District personnel taught and observed Student for an additional three months before developing the March 2022 IEP, which included educator input through February 2022. Third, in criticizing the District for not incorporating the independent evaluator's recommendations, they essentially seek to compel the District to provide the program of their choice.

Moreover, the District permissibly determined Student's class sizes and locations under the March 2022 IEP "based on scheduling and where it worked for the [school]'s schedule[.]" ECF No. 8-7 at 282:21–24. "In selecting special education programs, a school district must be able to take into account not only the needs of the disabled student, but also the financial and administrative resources that different programs

---

[8] Citations to ECF No. 26 refer to the document's internal page number.

will require, and the needs of the school's other non-disabled students." *Ridley*, 680 F.3d at 279 (citations omitted). While Plaintiffs contend the District should have provided academic instruction "in the morning when [Student's] attention was significantly better," ECF No. 21-1 at 31, they do not establish that the schedule as created conferred *no* meaningful educational benefit on Student. And the March 2022 IEP addressed Student's speech and language needs through goals and SDIs directed towards their improvement. *See* ECF No. 8-17 at 26–27, 30, 33, 36.

Plaintiffs state Student's special education placements throughout the year were inappropriate, ECF No. 21-1 at 21–22, but only argue her initial placement in autistic support failed to meet her needs. *Id.* at 29. However, Parents agreed to this placement under the Interim Plan, and its ultimate unsuitability does not retroactively render the Interim Plan substantively deficient. In any event, once the District realized autistic support was inappropriate, it switched Student to learning support.

Finally, Plaintiffs argue the IEPs lacked "necessary research-based instruction," *id.* at 30, in "academics or social skills." *Id.* at 14, 18. But Student's educators testified she did, in fact, receive research-based academic instruction, *i.e.*, Reading Mastery and Math Concepts, beginning in October 2021. ECF No. 8-7 at 244:20–245:16, 277:5–13. While the District did not provide research-based social skills instruction, "the lack of a peer-reviewed . . . program alone" does not necessarily "result in the denial of a FAPE[.]" *Ridley*, 680 F.3d at 275. Plaintiffs "[do] not specifically address" why the offered program was "an insufficient mode of instruction. [Plaintiffs'] desire for" a research-based method "does not sully the appropriateness of" another. *Souderton Area Sch. Dist. v. J.H.*, No. 08-2477, 2009 WL 349733, at *10 (E.D. Pa. Feb. 11, 2009), *aff'd sub nom. Souderton Area Sch. Dist. v. J.H. ex rel. J.H.*, 351 F. App'x 755 (3d Cir. 2009).

In sum, neither the November 2021 nor the March 2022 IEP substantively denied Student a FAPE.

## 2. <u>Section 504</u>

To establish a violation under Section 504, a plaintiff must show: (1) she is "disabled" as defined by the statute; (2) she is otherwise qualified to participate in a school program; (3) the program receives

federal financial assistance; and (4) she "was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Lauren G.*, 906 F. Supp. 2d at 388 (citing *Ridgewood*, 172 F.3d at 253). "There are few differences, if any, between IDEA's affirmative duty" to provide a FAPE and Section 504's prohibition against discrimination. *Id.* at 387 (citing *Ridgewood,* 172 F.3d at 253). In other words, "[d]enial of a FAPE satisfies prong four because '[i]t is the denial of an education that is guaranteed to all children that forms the basis of the claim.'" *Id.* at 388 (quoting *Andrew M.*, 490 F.3d at 350).

The Parties dispute only the fourth prong. The Court concludes that the District violated Section 504 because it denied Student a FAPE for the reasons discussed above.

### B.  Remedies for Denial of FAPE

To remedy a school district's denial of FAPE, a "court may award compensatory relief . . . in the form of appropriate educational services within the district, sometimes referred to as 'compensatory education.'" *Coleman*, 983 F. Supp. 2d at 566 (citing *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 60 (3d Cir. 2010)). The IDEA also "'confers broad discretion on the court' and . . . , absent any indication to the contrary, what relief is 'appropriate' must be determined in light of the [IDEA's] broad purpose of providing children with disabilities a FAPE, including through publicly funded private-school placements when necessary." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238 (2009) (quoting *Burlington*, 471 U.S. at 369).

#### 1.  Compensatory Education

"[T]he calculation for compensatory relief should be for a period equal to the period of deprivation, less the time reasonably required for the school district to rectify the problem." *Coleman*, 983 F. Supp. 2d at 567 (citing *Mary T.*, 575 F.3d at 249). "In certain circumstances, 'full days of compensatory education (meaning one hour of compensatory education for each hour that school was in session) may be warranted when the overarching impact of a district's denial of FAPE resulted in a pervasive loss of a student's educational benefit.'" *Upper Darby*, 2023 WL 4826736, at *13 (citing *R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 349 (E.D. Pa. 2020)).

The District denied Student FAPE from August 31, 2021 to October 25, 2021, by failing to provide an RBT; from August 31, 2021 to November 16, 2021, because it never intended to monitor Student's progress under the Interim Plan; from August 31, 2021 to November 24, 2021, by delaying Student's FBA and PBSP; from November 17, 2021, to March 3, 2022, by failing to provide a one-to-one aide outside the general education classroom; and from March 4, 2022, to the end of the school year because the revised IEP could not have accounted for any lack of expected progress under the previous IEP. On this record, though, the Court cannot determine a reasonable time to rectify each of these mistakes. Nor can it discern the extent to which each mistake "pervaded [Student's] entire school day." *Heather D. v. Northampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 557 (E.D. Pa. 2007) (denying compensatory education for full days where a student appeared to be making some academic progress). Accordingly, this case is remanded to the Issuing Officer to calculate a compensatory education award consistent with this opinion.

### 2. Prospective Private School Placement

The Parties dispute whether Student is entitled to prospective private school placement. They agree, however, that the *Burlington-Carter* test for tuition reimbursement should apply. *See* ECF No. 21-1 at 28–30; ECF No. 22 at 23. As applied to prospective placement, "the party seeking relief must show: (1) the public school did not provide a FAPE; (2) placement in a private school [would be] proper; and (3) the equities weigh in favor of" placement. *R.B.*, 509 F. Supp. 3d at 352 (citing *Florence Cnty. Sch. Dist. Four v. Carter by and through Carter*, 510 U.S. 7, 12–16 (1993); *Burlington*, 471 U.S. at 374).

Because the Issuing Officer concluded the District provided a FAPE for the bulk of the 2021–22 school year, he rejected private school placement outright. *Id.* He reached no factual conclusions or credibility determinations as to the appropriateness of placement at the Talk School. Nor did he balance the equities. As such, this Court orders the Issuing Officer to analyze whether placement in the Talk School would be proper and whether the equities favor placement on remand.

### C. **Attorneys' Fees and Costs**

The IDEA authorizes courts to award "reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability[.]" 20 U.S.C. § 1415(i)(3)(B)(i)(I). "For attorneys' fees purposes, a party prevails only if he obtains relief that is in some way merits-based." *Upper Darby*, 2023 WL 4826736, at *14 (quoting *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017)) (cleaned up).

Plaintiffs have prevailed on the merits as this Court finds Student was denied a FAPE during the 2021–22 school year. Plaintiffs are therefore entitled to reasonable attorneys' fees and costs. The Court will defer ordering payment until Plaintiffs file a petition for attorneys' fees and costs and the District files its response.

## VI. **CONCLUSION**

For the reasons set forth above, the Court affirms that the District denied Student a FAPE from August 2021 to November 2021 by delaying issuance of her FBA and PBSP and failing to monitor her progress under the Interim Plan. The Court also finds that the District denied Student a FAPE during this time period by failing to provide the required RBT. The Court reverses the finding that the District provided FAPE from November 2021 to March 2022. The District denied FAPE by failing to provide Student with one-to-one support outside of her general education classroom. The Court reverses the finding that the District provided FAPE from March 2022 to June 2022. The District denied FAPE by not accounting for any lack of progress when revising Student's IEP. The Court vacates the award of compensatory education and remands this case to the Issuing Officer to calculate compensatory education in accordance with this opinion and to determine whether prospective private school placement is appropriate. An appropriate order follows.